2026 IL App (1st) 250107-U

FIFTH DIVISION
June 30, 2026

No. 1-25-0107

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 0859601 |
| | ) | |
| MICHAEL ROBINSON, | ) | Honorable |
| | ) | Angela M. Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's second-stage dismissal of the defendant's postconviction petition is affirmed where he failed to make a substantial showing that his trial counsel provided ineffective assistance by interfering with his right to testify.

¶ 2    Defendant Michael Robinson appeals from the circuit court's second-stage dismissal of his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*) (West 2022)). Mr. Robinson argues that he made a substantial showing in his petition that his trial counsel provided ineffective assistance by interfering with his right to testify. Because Mr. Robinson's conclusory assertion about the content of his proposed testimony is insufficient to

establish that he suffered prejudice from any deficiency in counsel's performance, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Following a 2013 jury trial, Mr. Robinson was convicted of aggravated domestic battery and two counts of domestic battery. He was sentenced to 18 years in prison for aggravated domestic battery, concurrent with terms of 6 years in prison on each count of domestic battery. On direct appeal, pursuant to an agreed motion for summary disposition, we vacated one of his domestic battery convictions under the one-act, one-crime doctrine, reduced his sentence on the remaining domestic battery conviction to three years in prison, because the six-year term was an improper extended-term sentence, and affirmed his conviction and sentence for aggravated domestic battery. *People v. Robinson*, No. 1-17-0790 (2019) (dispositional order).

¶ 5                                    A. The Trial

¶ 6                                    1. The State's Evidence

¶ 7      At trial, Nina Scott testified that she had dated Mr. Robinson intermittently for 17 years, and he was the father of her oldest child. On May 13, 2011, she drove with Mr. Robinson from South Bend, Indiana, where she lived, to Chicago, where she was scheduled to work an evening shift at a KFC restaurant. When they arrived at the restaurant, Mr. Robinson, who was in the passenger seat, accused her of sleeping with his cousin. He then punched her in the right eye and told her to drive away. As she left the parking lot, he punched her in the right eye again, causing her to lose control of the steering wheel and drive into traffic. He told her to pull over and punched her in the right eye a third time. Ms. Scott testified that her face "was throbbing like it was swelling up," and she felt like she was "fading out."

¶ 8      Mr. Robinson then asked Ms. Scott whether she wanted to go to work or to the hospital, and she said the hospital. Instead, he directed her to drive to his friend's house. She followed his

directives out of fear that he would hit her again. When they arrived, Mr. Robinson exited the car while Ms. Scott remained in it. His friend gave her an ice pack. She called her friend Lashawnda James and told her what had happened. She did not drive away because she was scared that Mr. Robinson "might run after [her] car and catch [her]." When Mr. Robinson returned to the car, he told her to call Ms. James and ask if they could sleep at her home that night. Ms. Scott called Ms. James again, and she and Mr. Robinson then picked up Ms. James and her children and drove to Ms. James's apartment, where they spent the night. Ms. Scott did not call the police because she feared Mr. Robinson would hit her again.

¶ 9    Upon waking the next morning, Mr. Robinson asked Ms. Scott if she had bought his cousin some shoes. When she said she had, he punched her in the left eye. She screamed, and Ms. James ran into the room and began arguing with Mr. Robinson. Ms. Scott sent text messages to both her sister and Ms. James, asking them to call the police. Police officers arrived, Ms. Scott told them what happened, and they took Mr. Robinson away. Ms. Scott drove to the hospital and learned that her nose and orbital bone had been broken. Later that day, she spoke with a detective at the police station and told him what had happened, and the following day she spoke with an assistant state's attorney.

¶ 10    In May 2012, Ms. Scott signed an affidavit stating that she no longer wished to proceed with charges against Mr. Robinson. She testified that she signed the affidavit because she was "under a lot of pressure" at that time—she was working two jobs, Mr. Robinson was calling and writing her about signing the affidavit, and she "just wanted everything to practically be over." The State presented two letters from Mr. Robinson to Ms. Scott. One, dated April 17, 2012, said, "Dear Nina: I thank you for sending me my birthday card, and I really need you to go get the affidavit notarized and make some copies and sign and put your phone number because you do not

3

have to come to court if you think they will be on some bullshit."

¶ 11    Pursuant to a motion to admit proof of other crimes that the court had granted before trial, Ms. Scott also testified regarding an incident with Mr. Robinson that occurred on July 10, 2005. That night, she was sleeping in her mother's house. Around 3 a.m., she heard a noise and woke up. Mr. Robinson was standing at the foot of her bed, pointing a gun at her and "clicking" it. She screamed for her parents and he fled.

¶ 12    On cross-examination, defense counsel asked Ms. Scott about inconsistencies between her trial testimony and the statements she gave in May 2011 to the detective and the assistant state's attorney regarding whether Mr. Robinson had apologized for hitting her, whether they were at his friend's apartment for 30 minutes or 2 hours before they went to Ms. James's, and whether it was Mr. Robinson or his friend who gave her an ice pack.

¶ 13    Ms. James testified that Ms. Scott called her on the afternoon of May 13, 2011. She called again later and asked if she and Mr. Robinson could stay at her home. Ms. James said they could, and they picked up Ms. James and her children and drove to Ms. James's apartment. Ms. James noticed that Ms. Scott's left eye was swollen and she was trying to cover it. She had seen Ms. Scott the day before and her face had not been swollen. Ms. Scott and Mr. Robinson slept in Ms. James's bedroom while she and her children slept in the living room.

¶ 14    The next morning, Ms. James's children woke her because they heard a noise. Ms. James heard Ms. Scott "whimper." Ms. James went to the bathroom to dress, passing the bedroom. She saw Mr. Robinson and Ms. Scott standing face-to-face while Ms. Scott, who leaned on the wall, cried and Mr. Robinson held his fist at chest-level "like he was about to hit her." Ms. James told Mr. Robinson that he could not do that in her house, and Mr. Robinson told Ms. Scott to get dressed so they could leave. Ms. Scott went to the bathroom and texted Ms. James to call the police, which

4

she did. Because Mr. Robinson was nearby, Ms. James was unable to speak with the dispatcher but left the line open. She also texted Ms. Scott's sister her address. Ms. Scott's sister said in a text message that the police were on their way, and Ms. James opened a side door for the officers. They arrived, spoke with Ms. Scott and Mr. Robinson, and took Mr. Robinson away.

¶ 15    Chicago police officer Julius Beacham testified that he was one of the officers who responded to the calls to come to Ms. James's apartment. Mr. Robinson told the officers that Ms. Scott "got beaten up by another group of women." When the officers tried to speak with Ms. Scott, whose eye was swollen and turning black, Mr. Robinson was "disruptive," saying, "Tell them this is what happened," until the officers separated them.

¶ 16    Chicago police sergeant Robert Costello testified that, on May 14, 2011, he was a detective and interviewed Ms. Scott at the police station. Her eyes were swollen and her face was puffy. Sergeant Costello, along with an assistant state's attorney, met with Ms. Scott again the next day, and her swelling had grown more severe. Ms. Scott said that Mr. Robinson had caused her injuries. She said that they had been at Mr. Robinson's friend's apartment for a couple of hours and that Mr. Robinson had apologized to her. When she initially met with Sergeant Costello on May 14, Ms. Scott said that Mr. Robinson's friend was the one who had given her ice, but on May 15 she said it had been Mr. Robinson who gave it to her.

¶ 17    Dr. Shirley Montgomery testified that on May 14, 2011, she treated Ms. Scott, who reported being beaten that day and the day prior. Ms. Scott had a fractured nasal bone, a fractured right eye socket, severe bruising and swelling of the right eye, and some swelling and redness of the left eye. The injuries were consistent with being punched multiple times.

¶ 18    As other-crimes evidence, Mozella Cartharn testified that she began dating Mr. Robinson around June 2008 and broke up with him in August 2008. On September 25, 2008, Ms. Cartharn

was walking home and saw Mr. Robinson following her in his car. He called her name, and she ignored him. She tried to cross the street but he cut her off and continued to follow her after she walked around his car. He then got out of his car, ran up behind her, put his arm around her neck, and threw her to the ground, which caused bruising to her buttock and lower back. He threatened to have some girls beat her up if she left him. He then ran back to his car. Ms. Cartharn ultimately obtained an order of protection against him.

¶ 19                    2. Mr. Robinson Chooses Not to Testify and Is Convicted

¶ 20    After the State rested and the court denied Mr. Robinson's motion for a directed verdict, the court asked Mr. Robinson's attorney whether Mr. Robinson was going to testify. Counsel responded that he believed Mr. Robinson would not testify. The court then had the following colloquy with Mr. Robinson:

> "THE COURT: Mr. Robinson, what is your decision as to whether or not to testify at your own trial?
>
> DEFENDANT ROBINSON: No, ma'am.
>
> THE COURT: You have an absolute right to testify at your own trial. That right is yours to exercise exclusively, of course, after consultation with your attorney. Now, is it your decision and your decision only to not testify at your own trial[?]
>
> DEFENDANT ROBINSON: Yes, ma'am."

¶ 21    The defense rested, after admitting a copy of Ms. Scott's 2012 affidavit stating that she wished not to proceed with charges against Mr. Robinson.

¶ 22    Following argument, the jury found Mr. Robinson guilty of one count of aggravated domestic battery and two counts of domestic battery. On May 30, 2013, the trial court sentenced him to 18 years in prison on the count of aggravated domestic battery, concurrent with terms of 6

years in prison on each count of domestic battery.

¶ 23          B. Mr. Robinson Seeks a Direct Appeal and Files a Postconviction Petition

¶ 24    Mr. Robinson did not file a timely notice of appeal from his conviction. He filed a *pro se* motion for leave to file a late notice of appeal, stating that he failed to file a timely notice of appeal because his attorney was supposed to have done it. We denied the motion for lack of jurisdiction. See *People v. Robinson*, No. 1-14-0394 (2014) (dispositional order) (denying leave to file a late notice of appeal for lack of jurisdiction).

¶ 25    In December 2014, Mr. Robinson filed a *pro se* postconviction petition under the Act. He raised several claims, including that his trial counsel was ineffective for not filing a notice of appeal and refusing to allow him to testify. He stated that he "ask[ed] counsel to put him on the witness stand to testify on his own behalf and counsel stated that he would resign from the case if [he] pursued that." The circuit court advanced Mr. Robinson's claim that his attorney provided ineffective assistance for failing to file a notice of appeal to the second stage but dismissed his other claims. After appointing Mr. Robinson postconviction counsel, the court then vacated its prior ruling and ordered that all of Mr. Robinson's claims advance to the second stage.

¶ 26    In February 2017, the circuit court granted Mr. Robinson leave to file a late notice of appeal from his conviction, and he filed a notice of appeal. On appeal, we allowed Mr. Robinson's agreed motion for summary disposition, as noted above. Proceedings then continued on the remainder of Mr. Robinson's postconviction petition.

¶ 27          C. Proceedings on Postconviction Counsel's Amended Petition

¶ 28    On November 27, 2023, postconviction counsel filed an amended postconviction petition claiming that Mr. Robinson was denied the effective assistance of trial counsel because trial counsel interfered with his right to testify. The petition alleged that Mr. Robinson was prejudiced

because, given that he and Ms. Scott were alone when he allegedly struck her, he was the only person who could provide alternate testimony about what happened, and Ms. Scott's testimony went "essentially unchallenged."

¶ 29 In an attached affidavit, Mr. Robinson averred that, before trial, he told his retained counsel that he wanted to testify but counsel did not prepare him to do so. During trial, when the time grew near to tell the court whether he would testify, he again told his attorney that he wished to testify. Counsel responded that "he would stop representing [Mr. Robinson] if [Mr. Robinson] took the stand." Mr. Robinson believed that, if he testified, counsel would "walk out on [him] in the middle of trial and leave [him] without an attorney." Because of that threat, Mr. Robinson told the trial court that he did not want to testify. "In reality, [he] did wish to testify, and [he] would have testified and denied the allegations against [him] if [his] attorney had not prevented [him] from doing so."

¶ 30 The State filed a motion to dismiss the amended petition. The State contended that Mr. Robinson's claim was rebutted by the record because the trial court confirmed with Mr. Robinson that it was his decision alone not to testify, and that Mr. Robinson's allegation about the content of his testimony was conclusory and insufficiently detailed.

¶ 31 Following a response by Mr. Robinson's counsel and a hearing for the parties to present arguments, the court granted the State's motion. In a written order, the court found that nothing in the record indicated that Mr. Robinson was "unsure about waiving his right to testify," and his responses to the trial court's admonishments about his right to testify rebutted his allegations "that his decision not to testify was involuntary or based on a threat by counsel to withdraw." The court further found that he failed to make a substantial showing of prejudice because he had not explained how his proposed testimony created a reasonable probability that the result of the trial

would have been different, and his argument that his denials of Ms. Scott's allegations would have done so overlooked the evidence "that strongly corroborated" her testimony. This appeal follows.

¶ 32                                    II. JURISDICTION

¶ 33     The circuit court dismissed Mr. Robinson's amended postconviction petition on January 9, 2025, and he timely filed a notice of appeal the same day. We have jurisdiction over this appeal pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 606 (eff. Apr. 15, 2024) and Rule 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 34                                    III. ANALYSIS

¶ 35                                    A. Overview of the Act

¶ 36     The Act provides a three-stage process for a criminal defendant to claim that his conviction resulted from a substantial deprivation of his constitutional rights. *People v. Harris*, 2025 IL 130351, ¶¶ 31-32. "At the first stage, the circuit court determines whether the petition is frivolous or patently without merit." *Id.* ¶ 32 (citing 725 ILCS 5/122-2.1(a)(2) (West 2022)). At the second stage, if the defendant is *pro se*, indigent, and wishes to be appointed counsel, the court appoints him counsel to amend the petition as necessary, and the State may move to dismiss the petition. *Id.* (citing 725 ILCS 5/122-4, 122-5 (West 2022)). The court must determine at the second stage whether the allegations in the petition and any accompanying documentation make a substantial showing of a constitutional violation. *Id.* ¶ 33. A substantial showing means that the petition's well-pled allegations, if proven, would entitle the defendant to relief. *Id.* ¶ 39.

¶ 37     In making the second-stage determination, the court must take as true "all well-pleaded facts that are not positively rebutted by the original trial record." *People v. McCoy*, 2026 IL 131565, ¶ 49. The court may not engage in fact-finding or make credibility determinations at the

second stage. *Id.* However, "[n]onfactual and nonspecific assertions which merely amount to conclusions" are insufficient to justify advancing a petition past the second stage. *People v. Coleman*, 183 Ill. 2d 366, 381-82 (1998).

¶ 38    If the petition and accompanying documentation make a substantial showing of a constitutional violation, the petitioner is entitled to a third-stage evidentiary hearing. *Harris*, 2025 IL 130351, ¶ 33 (citing 725 ILCS 5/122-6 (West 2022)). It is not until the third stage that the petitioner's allegations cease being taken as true and the court may weigh the evidence and make credibility determinations. *McCoy*, 2026 IL 131565, ¶ 50. Where, as here, the petitioner appeals a second-stage dismissal, our review is *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 39                              B. Mr. Robinson's Petition

¶ 40    Mr. Robinson argues that his petition made a substantial showing that his trial counsel provided ineffective assistance by interfering with his right to testify. Claims of ineffective assistance are governed by the two-pronged test from *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Rouse*, 2022 IL App (1st) 210761, ¶ 24. That standard requires a showing that (1) counsel's performance was deficient because it "was objectively unreasonable under prevailing professional norms," and (2) counsel's deficient performance prejudiced the defendant. (Internal quotation marks omitted.) *Id.* A defendant establishes prejudice where "there is a reasonable probability that the result of the trial would have been different had counsel performed adequately." *Id.*

¶ 41    "[T]he decision whether to testify in one's own defense during a criminal trial is a fundamental constitutional right that belongs solely to the defendant." *People v. Knapp*, 2020 IL 124992, ¶ 46. Nevertheless, the decision should be made with the advice of counsel. *Id.* Thus, counsel may not be found ineffective for merely advising the defendant not to testify, "unless

evidence suggests that counsel refused to allow the defendant to testify." *People v. Youngblood*, 389 Ill. App. 3d 209, 217 (2009).

¶ 42    We conclude that Mr. Robinson did not make a substantial showing that any interference with his right to testify by counsel prejudiced him at trial. We therefore need not decide whether he made a substantial showing on the deficiency prong, as "once it is clear that no prejudice is established, the examination of the first prong of the *Strickland* test *** is not required." *People v. Hernandez*, 351 Ill. App. 3d 28, 39 (2004). Likewise, we need not decide whether the record rebuts Mr. Robinson's claim that he was coerced into giving up his right to testify, as the circuit court found and the State maintains.

¶ 43    Mr. Robinson asserts that he has made a substantial showing that there is a reasonable probability that the result of his trial would have been different but for counsel's interference with his right to testify. He notes that Ms. Scott testified that she and Mr. Robinson were alone when he struck her, and he is therefore the only person who could provide alternate testimony as to what occurred. He also argues that inconsistencies between Ms. Scott's trial testimony and her statements to police show that there is a genuine credibility contest between her allegations and his proposed denial of those allegations that must be resolved at an evidentiary hearing. He argues that the "lack of detail" in his proposed testimony is not fatal to his claim, citing *People v. Piper*, 272 Ill. App. 3d 843 (1995), and *People v. Seaberg*, 262 Ill. App. 3d 79 (1994).

¶ 44    Mr. Robinson is correct that, at the second stage, his well-pled facts must be accepted as true and neither the circuit court nor this court may make factual findings or credibility determinations. *McCoy*, 2026 IL 131565, ¶ 49. However, the fact that this case concerns the second stage of proceedings under the Act differentiates it from *Piper* and *Seaberg*. In each of those cases, the appellate court found that the petitioner's failure to set out the substance of his intended

11

testimony did not prevent him from stating, at the first stage of proceedings, the gist of a claim that his attorney provided ineffective assistance by depriving him of the right to testify. *Piper*, 272 Ill. App. 3d at 848-49; *Seaberg*, 262 Ill. App. 3d at 83-84. While this may be sufficient at the first stage, "several Illinois courts have held that in order to avoid dismissal at the *second* stage of proceedings, a defendant is required to include the substance of his intended testimony to demonstrate prejudice" under *Strickland*. (Emphasis in original.) *People v. Burns*, 2019 IL App (4th) 170018, ¶ 22 (citing *People v. Barkes*, 399 Ill. App. 3d 980, 989-90 (2010) and *Youngblood*, 389 Ill. App. 3d at 218-19, and distinguishing *Piper*).

¶ 45    We agree with those cases. Mr. Robinson's bare assertion that he would have "denied the allegations against [him]" is too nonspecific and conclusory to make a substantial showing that he was prejudiced. Conclusory statements are statements that, like Mr. Robinson's, "express 'a factual inference without stating the underlying facts on which the inference is based.' " *People v. Griffin*, 2024 IL 128587, ¶ 61 (quoting Black's Law Dictionary (11th ed. 2019)). Mr. Robinson provides no underlying facts showing that his testimony would have created a credibility contest with Ms. Scott.

¶ 46    *Barkes* is particularly instructive. There, the defendant was convicted of numerous counts of criminal sexual assault for having sexual intercourse with the 13-year-old victim multiple times. *Barkes*, 399 Ill. App. 3d at 981. He claimed in a postconviction petition that his counsel was ineffective for refusing to allow him to testify because he would have "refute[d] allegations made by [the victim] *** [and] dispell [*sic*] the illusion that [the victim] had no motive to testify." *Id.* at 982. On appeal from the dismissal of his petition at the second stage, this court concluded that, "[w]ithout specifying which allegations he would have refuted, this assertion [wa]s conclusory and [could] be disregarded." *Id.* at 990. The defendant had not indicated that he would have testified

"he did not have sexual intercourse with [the victim] or that he was not in a position of trust, authority, or supervision over her, the central issues in the case." *Id.*

¶ 47    Like the defendant in *Barkes*, Mr. Robinson has not indicated which allegations against him he would have denied or how he would have explained why any of the witnesses besides Ms. Scott testified the way that they did. Ms. Scott provided specific testimony that he struck her multiple times in the car on May 13, 2011, and struck her again the next morning in Ms. James's apartment. Ms. James testified that she saw Mr. Robinson standing before Ms. Scott with his fist raised. Officer Beachem testified that he saw Mr. Robinson try to coach Ms. Scott in her statements to the police when they arrived. Mr. Robinson's failure to explain which allegations he would have denied or why any of these witnesses testified as they did means that he has not made a substantial showing of prejudice. *Id.*

¶ 48    Mr. Robinson's case is very different from *Rouse*, which he cites in his reply brief. There, the defendant was convicted of armed robbery after two victims identified him as the person who took between $2700 and $3000 in cash and a Blackberry cell phone from them and he was then arrested while carrying $2995 and a Blackberry cell phone. *Rouse*, 2022 IL App (1st) 210761, ¶¶ 5-11. He claimed in a postconviction petition, which was dismissed at the second stage, that his counsel was ineffective both for preventing him from testifying and for not calling his sister to testify. *Id.* ¶¶ 16-19. He alleged in an affidavit that he had the cash to pay fines for driving with a suspended license, and that his sister could verify that he had the money before he left home that day. *Id.* ¶ 19.

¶ 49    Thus, in *Rouse*, the defendant's affidavit provided an alternate explanation for why he seemingly possessed the proceeds of a robbery. This created a credibility contest between the State's witnesses and the defendant and his sister, which necessitated an evidentiary hearing.

*Id.* ¶¶ 62-66. In contrast, Mr. Robinson's affidavit does not provide an alternate explanation for how Ms. Scott's injuries occurred or why he was standing before Ms. Scott with his fist raised, while she cried, on the day that she presented to police officers and a doctor with facial injuries. He did not even allege that he would have testified that a group of women beat Ms. Scott up, which, according to Officer Beachem, is what he told the police officers had happened. We are further unpersuaded by Mr. Robinson's comparisons to *People v. Lester*, 261 Ill. App. 3d 1075 (1994), because, as other decisions have pointed out, there was a "complete failure" by the appellate court in *Lester* "to address the prejudice prong of the ineffective-assistance-of-counsel test." *People v. Buchanan*, 403 Ill. App. 3d 600, 608 (2010).

¶ 50    In sum, Mr. Robinson's nonspecific assertion that he would have denied the allegations against him does not create a substantial showing of prejudice under *Strickland*. Accordingly, the circuit court properly granted the State's motion to dismiss his petition.

¶ 51                                   IV. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.